UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EDDIE STEWART,

             Plaintiff,

v.

MARATHON PETROLEUM
COMPANY, LP, et al.,

             Defendants.

_____/

Case No. 2:18-cv-12510

HONORABLE STEPHEN J. MURPHY, III

**OPINION AND ORDER**
**GRANTING MOTIONS FOR SUMMARY JUDGMENT [64, 65]**
**OF DEFENDANTS G4S SECURE SOLUTIONS AND QUALITY CARRIERS**

Plaintiff Eddie Stewart sued Defendants after a tanker truck he was driving exploded. ECF 1. At the end of extensive pretrial litigation, Defendants G4S Secure Solutions ("G4S") and Quality Carriers ("QC") moved for summary judgment. ECF 64; 65. Defendant Marathon Petroleum did not file a dispositive motion. Plaintiff responded to G4S's motion, ECF 67, but did not respond to QC's motion. The Court reviewed the briefing and finds that a hearing is unnecessary. *See* E.D. Mich. L.R. 7.1(f)(2). For the following reasons, the Court will grant the motions of G4S and QC.

**BACKGROUND**

Plaintiff is a professional truck driver and was an independent contractor for QC. ECF 67-2, PgID 1875–76. QC is a "chemical transportation company." *Id.* at 1879. Marathon Petroleum owns and operates a refinery in Detroit, Michigan. ECF

65-9, PgID 1826. G4S is a private security company that was contracted by Marathon to "secure" and "control" the Detroit refinery "perimeter." ECF 67-6, PgID 1965–66.

In 2015, Plaintiff was contracted by QC to be a driver of its chemical transportation tankers. ECF 67-2, PgID 1879. In August 2016, QC directed Plaintiff to transport and deliver chemical materials from the Detroit refinery to Texas. *Id.* at 1882–84.[1] And to prepare the tanker for safe transportation of the chemical prior to pick-up, QC also directed Plaintiff to wash the tanker with a caustic wash. *Id.* at 1883–84. On Plaintiff's arrival at the refinery, Marathon personnel loaded Plaintiff's tanker with what Plaintiff and Marathon believed was a "spin-off caustic soda." *Id.* at 1887, 1901. But unknown to all, the chemical loaded into the tanker was actually sulfuric acid (spent caustic), a highly corrosive acidic chemical. ECF 65-6, PgID 1805; *see* ECF 68-1, PgID 2178 (under seal).

While the chemical was being loaded into the tanker, Plaintiff noticed its dark color[2] and asked the Marathon employee about the chemical because he had "no experience in [his] years of delivering chemicals . . . with spin-off caustic." ECF 67-2, PgID 1887–88. Plaintiff notified QC that a spin-off of caustic soda was loaded into the tanker, *id.* at 1888, and then drove the tanker to a weigh area, ECF 68-1, PgID 2174 (under seal). There, Plaintiff found that the tanker was 2,400 pounds overweight. *Id.*

---

[1] The chemical Plaintiff was contracted to transport was Sodium Hydroxide, or "caustic soda," a base chemical. ECF 65, PgID 1657; ECF 67, PgID 1845; ECF 67-3, PgID 1943.
[2] Caustic soda is known to possess a "milky, creamy" color. ECF 67-2, PgID 1892.

Plaintiff then drove the tanker to an off-load area for Marathon personnel to take some of the chemical out of the load. ECF 67-2, PgID 1889. At that time, a G4S officer informed both Plaintiff and Marathon that her chemical detection device had sounded an alarm. *Id.* at 1893; ECF 64-15, PgID 1554–58, 1575–76. The device was calibrated to sound an alarm when there was a presence of hydrogen sulfide fumes— a "hazardous" and "corrosive" chemical. ECF 67-5, PgID 1947; *see* ECF 64-14, PgID 1523. A Marathon operator then inspected the trailer using a "sniffer" device that was designed to detect chemical fumes. ECF 67-2, PgID 1891. After the inspection, the operator told Plaintiff that he did not find any concerning smells or leaks coming from the tanker. *Id.* Once some of the chemical was offloaded, Plaintiff drove the tanker to the refinery exit. *Id.* at 1892–94.

At the exit, a G4S officer told Plaintiff that she "could still smell the product." ECF 67-2, PgID 1892, 1922. But Plaintiff did not inquire further after Marathon personnel released Plaintiff to leave the refinery. ECF 64-19, PgID 1630 ("If there's no issues with the truck, it's [the Marathon shift foreman's] decision to let [the tankers] leave.").

Just after Plaintiff left the refinery, he pulled over for about thirty minutes, ECF 67, PgID 1849, which was "a common occurrence," ECF 67-6, PgID 2041. Plaintiff's truck was within view of surveillance cameras manned by G4S personnel. ECF 67, PgID 1849–50. Surveillance video showed "a cloud [around] the truck." ECF 67-6, PgID 2015. But G4S personnel only noticed the "cloud" a day later after they

"zoom[ed] in" on the tanker during an investigation. *Id.* at 2042 (noting that the "cloud" may not have been evident in real time).

The next morning, Plaintiff stopped for fuel in Ohio. ECF 67-2, PgID 1895. There, Plaintiff noticed that the tanker was leaking. *Id.* Plaintiff then called Skytank, an emergency response company, and moved the truck away from the fueling station. *Id.* at 1895–96. After the call to Skytank, Plaintiff made his first and only call to QC. *Id.* at 1897. QC dispatch told Plaintiff to report back to Skytank. *Id.* The Skytank emergency responder instructed Plaintiff to move away from the tanker and call the fire department after it sprung a second leak and began making "popping and cracking" noises. ECF 67-2, PgID 1895, 1915; ECF 65-6, PgID 1802. Plaintiff instead sat in "the cab [of the tanker] to make phone calls." ECF 67-2, PgID 1897. Within an hour, the tanker exploded, and Plaintiff was injured. *Id.* at 1903–05.

## LEGAL STANDARD

Summary judgment is proper if the movant shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material for purposes of summary judgment if its resolution would establish or refute an "essential element[] of a cause of action or defense asserted by the parties[.]" *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quotation omitted).

The Court must view the facts and draw all inferences in the light most favorable to the non-moving party. *Stiles ex rel. D.S. v. Grainger Cnty.*, 819 F.3d 834, 848 (6th Cir. 2016) (citation omitted). The Court must then determine "whether the evidence presents a sufficient disagreement to require submission to a jury or

whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). And although the Court may not make credibility judgments or weigh the evidence, *Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015), a mere "scintilla" of evidence is insufficient to survive summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

Last, if the movant meets its burden under Civil Rule 56(a) of demonstrating the absence of a genuine issue of material fact, the burden shifts to the nonmovant to "cit[e] to particular parts of materials in the record" to show the presence of a genuine dispute. Fed. R. Civ. P. 56(c)(1). If the nonmovant fails to "properly address another party's assertion of fact as required by Rule 56(c), the [C]ourt may . . . consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e).

## DISCUSSION

I.    <u>Choice of Law</u>

The Court will first address G4S's motion. Then it will address QC's unopposed motion. Michigan law applies to both. "A federal court sitting in diversity faced with a choice-of-law issue applies the choice-of-law rules of the forum state." *Atlas Techs., LLC v. Levine*, 268 F. Supp. 3d 950, 961 (E.D. Mich. 2017) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). Michigan's choice-of-law rules for tort claims presume that Michigan law applies "unless a 'rational reason' to do otherwise exists." *Standard Fire Ins. Co. v. Ford Motor Co.*, 723 F.3d 690, 693

(6th Cir. 2013) (citing *Sutherland v. Kennington Truck Serv., Ltd.*, 454 Mich. 274, 286

(1997)). Whether a "rational reason" exists is determined by a two-step test:

> First, [the Court] must determine if any foreign state has an interest in having its law applied. If no state has such an interest, the presumption that Michigan law will apply cannot be overcome. If a foreign state does have an interest in having its law applied, [the Court] must then determine if Michigan's interests mandate that Michigan law be applied, despite the foreign interests.

*Sutherland*, 454 Mich. at 286.

Here, the Defendants' alleged negligence occurred almost entirely in Michigan

at the Marathon Detroit Refinery. *See* ECF 67-2, PgID 1884–94. Ohio and Louisiana

have some interest in having their laws applied because Plaintiff was injured in Ohio,

*id.* at 1895–98, and resides in Louisiana, *id.* at 1875. That said, those interests are

far outweighed by Michigan's interest in protecting its citizens from negligent

conduct, especially as it applies to dangerous activities like loading and transporting

explosive chemicals from Michigan refineries. Thus, "Michigan's interests mandate

that Michigan law be applied." *Sutherland*, 454 Mich. at 286.

II.   G4S's Motion for Summary Judgment

Plaintiff alleged in the complaint that G4S was negligent in eleven respects.

ECF 1, PgID 13. G4S's summary judgment motion argued against a duty or breach

of duty as to each claim. ECF 64, PgID 1366–70. Plaintiff's response, however,

essentially focused on the common law duty of ordinary care that G4S owed to

Plaintiff, rather than on the facts of each of the eleven allegations in the complaint.

*See* ECF 67, PgID 1854–64. And Plaintiff never identified any discovery materials

that established whether a genuine dispute of material fact existed. *See* ECF 67, PgID

1845–69. The Court must therefore consider the facts of the case to be undisputed on G4S's summary judgment motion.

To establish a prima facie case of negligence, a plaintiff must prove four elements: duty, breach of that duty, causation, and damages. *Fultz v. Union-Com. Assocs.*, 470 Mich. 460, 463 (2004). And "[i]t is axiomatic that there can be no tort liability unless defendants owed a duty to plaintiff." *Beaty v. Hertzberg & Golden, P.C.*, 456 Mich. 247, 262 (1997) (citation omitted). In Michigan, the question of whether a defendant owed a duty to a plaintiff is "separate and distinct from the defendant's contractual obligations." *Fultz*, 470 Mich. at 467. Michigan courts have recognized that "a separate and distinct duty to support a cause of action in tort can arise . . . by a number of preexisting tort principles, including duties imposed because of a special relationship between the parties, [] and the generally recognized common-law duty to use due care in undertakings." *Loweke v. Ann Arbor Ceiling & Partition Co.*, 489 Mich. 157, 169–70 (2011) (citations omitted). Put simply, a defendant that owes contractual duties to a plaintiff also owes a "separate and distinct" common law duty of ordinary care to a non-contracting third party. And although there is no general duty to act, if a person "voluntarily undertakes to perform an act, having no prior obligation to do so, a duty may arise to perform the act in a nonnegligent manner." *Fultz*, 470 Mich. at 465 (citations omitted).

The Court will first discuss the eleven allegations. After, the Court will turn to G4S's general common law duty of ordinary care.

A.    *Eleven Allegations of Negligence*

Plaintiff alleged in his complaint that G4S was negligent in its acts or omissions in eleven respects. ECF 1, PgID 13. The Court will examine each allegation in turn.

Plaintiff first alleged that G4S "[f]ail[ed] to adequately train and supervise security and inspection personnel." *Id.* But the generalized allegation contradicted the record evidence that suggests Marathon—not G4S—controlled training requirements and scheduling. The G4S site manager at the Marathon facility testified that Marathon issued hydrogen sulfide detection devices to G4S, ECF 67-6, PgID 1972, Marathon conducted initial "safety orientation" for G4S personnel, *id.* at 1975, and Marathon provided annual chemical detection training. *Id.* at 1974; ECF 64-14, PgID 1523. Most important, "Marathon decide[d] the . . . procedure" and "implement[ed] the [hydrogen sulfide] monitor hit protocol when[] there [was a hydrogen sulfide] alarm." ECF 67-6, PgID 1977–78.

Furthermore, testimony gathered during discovery revealed that when G4S faced a potential security breach, the company expeditiously followed the security and inspection procedures that were set forth by Marathon. If a security breach caused a G4S worker to receive an alert on their chemical detection device, then the protocol was to "inform their direct supervisor, which would be a G4S employee, and then the G4S supervisor would notify the Marathon supervisor." *Id.* at 1978, 1981 (The G4S officer "left the area of the truck. She notified [a G4S supervisor] . . . that she had received the [hydrogen sulfide] hit, [and] another supervisor . . . made sure

that the [hydrogen sulfide] monitor was docked."). A G4S officer testified during discovery that she confronted a hydrogen sulfide alert on her chemical detection device near Plaintiff's tanker and that she "responded appropriately." ECF 64-15, PgID 1561, 1567. In short, the evidence gathered in discovery shows that Plaintiff's allegation was misdirected because the duty to train and supervise G4S personnel was ultimately owed to Plaintiff by Marathon and not by G4S.

Even if G4S owed an intermediary supervisory duty to Plaintiff, G4S did not breach it because G4S personnel properly oversaw and complied with the appropriate safety and inspection protocol when they managed Plaintiff's truck. No evidence suggests that G4S failed to adequately train and supervise its employees, and Plaintiff did not point to any evidence at all in its response to G4S's summary judgment motion. *See* ECF 67, PgID 1845–69. G4S is therefore entitled to summary judgment on Plaintiff's first allegation in the complaint.

Plaintiff's second allegation asserted that G4S "[f]ail[ed] to develop, maintain and/or apply proper safety procedures." ECF 1, PgID 13. Similarly, Plaintiff's fifth allegation, that G4S "[f]ail[ed] to properly utilize chemical detection devices," *id.*, was subsumed by, although narrower than, the second allegation. Both generalized allegations, however, contradicted the evidence which establish that Marathon had a duty to ensure procedures that promoted the safety of the drivers. *See* ECF 67-4, PgID 1942–45 ("Marathon Safety Data Sheet" for "MPC Spent Caustic, Sodium Hydroxide"); ECF 67-5, PgID 1947–55 ("Marathon Safety Data Sheet" for "MPC Spent Sulfuric Acid"). G4S owed no such duty.

9

The available record evidence also illustrates that G4S's duties and responsibilities were, in the main, quite narrow. Marathon contracted G4S "to secure the [Marathon refinery] perimeter and control the perimeter, creating a hard target to deter criminal and terrorist activity." ECF 67-6, PgID 1966. And G4S also provided a checkpoint when the drivers left the refinery. *See generally* ECF 64-15, PgID 1567. When they received a chemical detection alert, G4S's only duty was to report the alert up the chain of command—and no further action by G4S was required. ECF 67-6, PgID 1978.

Here, a G4S officer testified at deposition that she did everything that was required of her while she was on duty at the security checkpoint. *See* ECF 68-1, PgID 2165 (under seal); ECF 64-15, PgID 1566–67. Nothing in Plaintiff's response contradicted the evidence that G4S did not fail to develop or apply safety procedures. The only argument Plaintiff offered to rebut the evidence were several accusations unmoored from the evidence. *See* ECF 67, PgID 1845–69. Plaintiff argued that "discovery reveals that G4S personnel were concerned about the fumes but took no action to prevent the tanker from leaving the refinery." ECF 67, PgID 1865. But the G4S officer did notify both Plaintiff and Marathon about the abnormal smell from the truck, the chemical device alert, and that she believed something was wrong with the truck. ECF 64-15, PgID 1570–72. In the end, G4S did not have the "authority to countermand or supersede a decision by Marathon at [the] facility." *Id.* at 1571. G4S's employees accordingly followed all relevant safety procedures that were sufficient for

their position as security of the plant perimeter. And no material facts show that G4S was negligent as to the second and fifth allegations in the complaint.

The third allegation in Plaintiff's complaint asserted that G4S "[f]ail[ed] to verify the exact product loaded into [the] tankers." ECF 1, PgID 13. As mentioned, the evidence reflects that G4S's duties and responsibilities were narrow and did not encompass the examination of chemicals, assurance of adequate safeguards to avoid erroneous chemical loading, or even compliance with federal or state law for the safe transportation of dangerous chemicals. G4S was a security company. And Marathon hired G4S to specifically "secure the [Marathon refinery] perimeter and control the perimeter, creating a hard target to deter criminal and terrorist activity." ECF 67-6, 1966. The evidence shows that G4S did not "have anything to do with [knowing] if [Marathon was] loading or not loading" or which tankers were "supposed to get" certain chemical loads. ECF 64-15, PgID 1566. And as one would expect of non-chemist security guards, G4S's security personnel could not know the difference between certain chemicals. *Id.* at 1569. No evidence supports the third allegation in the complaint—that G4S acted negligently.

In Plaintiff's complaint, his fourth allegation asserted that G4S "[f]ail[ed] to have in place adequate safeguards to prevent incorrect loading." ECF 1, PgID 13. By arguing the point, Plaintiff has once again extrapolated the available record evidence beyond the scope of what Marathon tasked G4S security personnel to do—secure the perimeter and report any chemical detector device alerts. Nothing in Plaintiff's response demonstrated that any G4S workers should have been overseeing the

loading of chemicals—that was in fact a job already delegated to and performed by Marathon workers. *See* ECF 67-2, PgID 1918 (a Marathon operator filled the tanker). As no evidence supports the complaint's fourth allegation that G4S was negligent, G4S is entitled to summary judgment on it.

The sixth allegation in Plaintiff's complaint was that G4S "[f]ail[ed] to have in place, maintain and/or apply safety procedures which would prevent incorrect loads." ECF 1, PgID 13. While that allegation restated in substance the fourth allegation of the complaint, it also added an "appl[ication]" element to the argument. *See id.* But the allegation still fails. Again, the record evidence shows that G4S provided perimeter security at the Marathon plant. And G4S therefore had no duty to "prevent incorrect loads." Thus, the issue of whether G4S applied fictitious safety procedures negligently is irrelevant to the question of how Plaintiff's alleged injuries were caused. For those and all the reasons set forth in the analysis of Plaintiff's fourth allegation, *supra,* Plaintiff cannot prevail against G4S on the sixth allegation in the complaint. There is no record evidence to support it.

The seventh allegation in Plaintiff's complaint contended that G4S "[f]ail[ed] to properly investigate the reason that its employee's chemical detection alarm was triggered or activated." ECF 1, PgID 13. But as mentioned above in the Court's analysis of Plaintiff's second allegation, G4S completed its investigative duty when it notified Marathon of the hydrogen sulfide alert. Marathon then had the ultimate ability to exercise discretion and continue to investigate. *See* ECF 67-6, PgID 1978; ECF 64-15, PgID 1571. No evidence supports Plaintiff's position that G4S was

required to perform additional investigative work. Accordingly, G4S is entitled to summary judgment on the seventh allegation of the complaint.

Plaintiff's eighth allegation blamed G4S for "[f]ailing to properly notify or warn Marathon or Stewart of the risks associated with the chemical substance alarm [when it] sounded, so as to assure that the cause was properly investigated and addressed." ECF 1, PgID 13. While Plaintiff's eighth allegation added more detail to the seventh allegation in the complaint, the claim is conclusory, and the facts stated within it are contrary to the record evidence developed in discovery. And the ninth allegation that blamed G4S for "failing to warn" Plaintiff is a vague statement unsupported by the evidence.

For one, Marathon did not task G4S employees to notify drivers and Marathon personnel of *risks* associated with any chemical substance alarm. *See* ECF 64-15, PgID 1556; ECF 67-6, PgID 1982. Rather, as detailed previously, Marathon tasked G4S to simply report an alarm and subsequent detection of the presence of chemical substances. ECF 67-6, PgID 1978, 1981–82. For another, the G4S officer assigned to work in the time frame relevant here *did* warn Plaintiff that she smelled something abnormal coming from the tanker. ECF 64-15, PgID 1555–56. Simply put, the facts stated in Plaintiff's eighth and ninth complaint allegations cannot show that G4S was in any way negligent, and G4S is entitled to summary judgment on the claims.

Plaintiff's tenth allegation in his complaint asserted that G4S violated "State and Federal laws regarding safe handling and transportation of hazardous chemicals, all of which are specifically plead[ed] here as if copied in extenso." ECF 1, PgID 13.

Those claims are legal conclusions, and they do not identify any specific laws or evidence to support whether G4S oversaw the safe handling and transportation of hazardous chemicals. As the Court has repeatedly found, there is no record evidence cited in Plaintiff's briefing that supports any of the facts asserted in the claim. Indeed, the evidence developed in discovery instead suggests that the duty to oversee handling and transporting chemicals was "above [G4S officers'] pay grade." ECF 64-15, PgID 1556. And absent the citation of any state or federal law by which a trier of fact would measure G4S's conduct, any subsequent evidence developed at trial could not possibly support the allegation. G4S is entitled to summary judgment on the tenth allegation of the complaint.

The complaint's final allegation is a catch-all statement: "Other acts or omissions that constitut[e] negligence which may be discovered during the pendency of these proceedings." ECF 1, PgID 13. Plaintiff did not establish any genuine issue of material fact as to the eleventh allegation because he did not point to any record evidence in dispute. *See* ECF 67, PgID 1845–69. G4S, however, argued in its papers that the only alleged act or omission that Plaintiff could point to in support of the catch-all allegation is a critical report prepared by a G4S supervisor about an employee "despite the fact that . . . the unrefuted testimony and evidence is that G4S followed all of the protocols and requirements it was required to in responding to the 'hit' that [the G4S officer's] device registered." ECF 64, PgID 1369; *see* ECF 67, PgID 1868. But internal communications among G4S employees and private reviews of the employees are not standards that sufficiently set out legal duties for G4S; they are

14

"private regulations which assist in the orderly and prudent conduct of business." *Gallagher v. Detroit-Macomb Hosp. Ass'n*, 171 Mich. App. 761, 765 (1988) (citing *Dixon v. Grand Trunk W. Ry. Co.*, 155 Mich. 169, 173 (1908)). The internal standards "do not fix the obligations and liability of [] [D]efendant to its employ[ee]s, nor even to third persons and the public. Those are fixed by law. [The law] could not be diminished by such rules, neither are they increased ordinarily thereby." *Dixon*, 155 Mich. at 173. Thus, even if Plaintiff had expressly alleged that the report prepared by the G4S supervisor was evidence of negligence, the claim would be buttressed insufficiently by facts. G4S is therefore entitled to summary judgment on the claims contained within the eleventh allegation.

B.    *Common Law Duty of Ordinary Care*

In Michigan, a defendant owes a "separate and distinct" common law duty of ordinary care to a non-contracting third party, the scope of which stretches beyond the defendant's contractual duties. *Loweke*, 489 Mich. at 169–70. The ordinary duty of care is "that care which a reasonably prudent person would exercise in similar circumstances." *Swartz v. Huffmaster Alarms Sys., Inc.*, 145 Mich. App. 431, 435 (1985).

To determine the "reasonably prudent person" standard, Michigan courts weigh several variables: (1) foreseeability of the harm; (2) degree of certainty of injury; (3) existence of a relationship between the parties involved; (4) closeness of connection between the conduct and injury; (5) moral blame attached to the conduct; (6) policy of preventing future harm; and (7) the burden and consequences of imposing

a duty and the resulting liability for breach. *Buczkowski v. McKay*, 441 Mich. 96, 101 n.4 (1992) (citing Prosser & Keeton, *Torts* § 53, at 359 n.24 (5th ed.)).

Whether a defendant breached a duty of care would ordinarily be a question of fact for a jury and would not be appropriately analyzed at the summary judgment stage. *Moning v. Alfono*, 400 Mich. 425, 438 (1977). But summary judgment is appropriate if a defendant can show that a plaintiff's evidence cannot in any sense demonstrate a breach of duty. *See Latham v. Nat'l Car Rental Sys., Inc.*, 239 Mich. App. 330, 340 (2000).

Plaintiff sweepingly alleged that "[i]t is . . . clear that G4S owed a duty to [Plaintiff] by both the 'separate and distinct' analysis and its common law duty of ordinary care to avoid harm." ECF 67, PgID 1859. In support, Plaintiff also said that "G4S knew that a cloud of vapor was forming above [Plaintiff's] truck after all the information G4S had gathered that evening." *Id.* at 1859, 1863 ("Observing fumes, odors, and clouds of vapor without warning [Plaintiff] is not reasonable under the circumstances."). Plaintiff also concluded that "the conduct of G4S personnel was closely connected to the injury." *Id.* at 1859. Plaintiff last summarily asserted that "if a guard at a chemical refinery sees something, he or she *must* take action," which is a "simple and obvious duty." *Id.* (emphasis added). But Plaintiff's logic gives rise to neither a genuine dispute of material fact nor a basis for denying G4S's motion for summary judgment. Three reasons support the conclusion.

First, the argument about the vapor cloud is misleading and inapplicable to the Court's duty analysis. The record evidence clearly shows that G4S did not see the

vapor cloud around Plaintiff's truck until *after* the tanker had ruptured. *See* 67-3, PgID 1939 ("Neither [Marathon] [n]or G4S saw product fumes emitting from the truck at the time of the incident."). No witness at all perceived the fumes or vapor in real time. *Id.* It follows, therefore, that G4S cannot be charged with knowing about the vapor cloud; it only learned of the cloud after the fact.

Second, the allegation that G4S personnel were "closely connected" to Plaintiff's injury is vague and conclusory. If Plaintiff suggests that G4S personnel were near the misloading of the chemicals, then the argument is inapposite: there is insufficient evidence of that fact. Moreover, there is no general legal duty to act, and a reasonably prudent person in G4S's position would not know how to ensure the correct chemical was loaded into the tanker—even if its personnel were near the loading spot. *See* ECF 64-15, PgID 1566, 1569. If, alternatively, Plaintiff suggests that G4S should have bypassed the chain of command and forced Plaintiff to not leave the refinery—despite Marathon's explicit authorization to do so—then the argument fails because a reasonably prudent person would not flout chain of command based on a concern that a supervisor assured the employee was baseless. That point is especially true when, as here, the supervisor had more expertise to determine whether a valid concern existed.

Last, Plaintiff asserted that G4S personnel "must" have acted. *Id.* at 1859. The statement implies that G4S security personnel were required to protect Plaintiff from

essentially any conduct or event that could have caused him harm.[3] But the assertion ignores the foundational principle that no person has an affirmative duty to act under the common law duty of care. *Williams v. Cunningham Drug Stores, Inc.*, 429 Mich. 495, 498–99 (1988) (citation omitted) ("[A]s a general rule, there is no duty that obligates one person to aid or protect another."); *see Fultz*, 470 Mich. at 465. There are few exceptions. *See, e.g.*, *Williams*, 429 Mich. at 499. And those situations do not apply here because G4S did not control the procedures that governed the loading of Plaintiff's tanker or that ultimately provided clearance for Plaintiff's tanker to leave the refinery. G4S did not select the tanker. G4S did not load the tanker. G4S did not fail to notify Plaintiff of the suspicious sounds and smells emanating from the tanker. G4S did not clear the tanker to leave the refinery, and G4S was never designated as the point of contact once the tanker left the refinery. At bottom, G4S had no general obligation to act based on the ordinary duty of care standard. The scope of G4S's common law duty of due care began only when a reasonably prudent person would have been expected to act. Thus, G4S's duty began when the chemical detector

---

[3] Plaintiff likens G4S to the security personnel in *Rhodes v. United Jewish Charities of Detroit*, 184 Mich. App 740, 741–42 (1990) and *Leone v. BMI Refractory Servs., Inc.*, 893 F.3d 359, 363 (6th Cir. 2018). ECF 67, PgID 1862–64. But those cases differ from the present case. *Rhodes* and *Leone* refer to security personnel failing to protect business invitees from intruders (assault in Rhodes) or negligent inspection (contractual duty in *Leone*)—conduct directly within the scope of each defendants' hired duties. *Leone*, 893 F.3d at 363; *Rhodes*, 184 Mich. App. at 743. Here, G4S personnel were hired to ensure safety of the perimeter and to check for fumes using chemical detection devices. G4S's scope of duty is therefore much narrower than Plaintiff suggests.

alerted. And G4S did not fail to report the alert on the chemical detector, so no evidence of breach exists.

In sum, Plaintiff cannot show a breach of duty. The Court will therefore grant G4S's summary judgment motion on the ordinary duty of care theory.

III.   Quality Carriers' Motion for Summary Judgment

Defendant QC also moved for summary judgment. ECF 65. Plaintiff did not respond to the motion. And the motion remains unopposed.

Discovery has demonstrated that QC is even further removed than G4S from the events leading to Plaintiff's injury. When Plaintiff notified QC that there was a potential leak from the tanker, QC immediately acted and fulfilled its duty of care. For those reasons, and for the additional reasons set forth below, the Court will grant QC's motion for summary judgment.

The Court must consider the *Buczkowski* factors to determine whether a defendant owed a duty to a plaintiff: (1) foreseeability of the harm; (2) degree of certainty of injury; (3) existence of a relationship between the parties involved; (4) closeness of connection between the conduct and injury; (5) moral blame attached to the conduct; (6) policy of preventing future harm; and (7) the burden and consequences of imposing a duty and the resulting liability for breach. 441 Mich. at 101 n.4 (citation omitted).

To begin, QC argued here that "[p]rior to the tanker rupture, there was no way for QC to know that due to an equipment 'glitch,' Marathon loaded the wrong chemical into the tanker, much less that the incorrect chemical was sulfuric acid

which would react with the tanker and cause it to rupture." ECF 65, PgID 1673. The evidence supports that argument. Marathon hired QC to transport a chemical substance from the Marathon refinery to Texas. ECF 67-2, PgID 1884. And QC coordinated with Plaintiff to pick up a QC tanker, take it to undergo a "caustic wash," and use it to transport the Marathon chemical. *Id.* at 1882–83. Plaintiff did not allege that QC was negligent in carrying out the initial coordination of the tanker's movement or the caustic wash process. And the record evidence shows that QC was uninvolved with Plaintiff or his tanker until Plaintiff called QC on the day the tanker ruptured. *See* ECF 65, PgID 1673–74.

Whether QC was negligent then, ECF 1, PgID 12, can only be plausibly addressed in light of when Plaintiff notified QC about possible damage to the tanker. Before that time, there was no "foreseeability" of harm, no "degree of certainty of injury," a lack of "closeness of connection between the conduct and injury," and no "moral blame attached to the conduct" leading to Plaintiff's injury. *See Buczkowski*, 441 Mich. at 101 n.4. The Court will therefore analyze the facts of the negligence claim against QC beginning from when Plaintiff notified QC of the leak. *See* ECF 67-2, PgID 1897 (Plaintiff explaining that he called QC when he saw "the first leak").

Plaintiff testified that on the day the tanker ruptured, he noticed "product coming out of the trailer," but the leak was "not too bad at first." *Id.* at 1895. When he saw the leak, Plaintiff testified, he first called Skytank, an emergency response company. *Id.* After the call to Skytank, Plaintiff made his first and only call to QC. *Id.* at 1897. At that point, it was unforeseeable that the chemical Plaintiff was

transporting would have reacted with the tanker because QC believed that the tanker was loaded with sodium hydroxide—not sulfuric acid. *Id.* at 1916 (Plaintiff denying that he told QC personnel that he "thought it was dangerous to continue to drive the truck"). Indeed, Plaintiff conceded that "[QC] wouldn't know whether or not there was any danger involved." *Id.* Thus, the rupture was unforeseeable to QC, and there was no degree of certainty of injury to Plaintiff.

What is more, given the physical distance between the parties at the time of the rupture, QC had a limited ability to help Plaintiff avoid injury. QC ensured that the emergency response company was in contact with Plaintiff. *Id.* at 1897. Plaintiff testified that QC advised Plaintiff to report to the emergency responder until the leaking issue was resolved. *Id.* And the emergency responder instructed Plaintiff to move away from the tanker and call the fire department well before the tanker ruptured. ECF 65-6, PgID 1802. But Plaintiff did not heed the instruction. He was accordingly, and predictably, injured by the explosion. *Id.* at 1803 ("I assumed that [Plaintiff] was away from the truck because I had instructed him to move away. And then after the tanker ruptured, I found out that he was actually sitting the cab when the tanker ruptured."). Although QC did have a safety relationship with Plaintiff that prompted the Plaintiff's phone call to QC, QC's conduct could have only helped Plaintiff if he had followed the instructions of the emergency response personnel. Plaintiff's choice to stay near the tanker was his own, and QC cannot be blamed for the injuries that resulted from it.

Last, as a matter of policy, QC is not an appropriate party on which to place liability. QC could have done nothing more to prevent the rupture or Plaintiff's injuries. Imposing negligence liability on QC would do nothing in the way of "preventing future harm." *See Buczkowski v. McKay*, 441 Mich. at 101 n.4.

The duty factors weigh against imposing liability on QC. And the Court will therefore grant QC's motion for summary judgment.

## CONCLUSION

The summary judgment motions of G4S and QC are granted. Plaintiff's only remaining claims are against Defendant Marathon.

The case has been pending since 2018. Because Marathon did not move for summary judgment, and due to the ongoing delay of all in-person jury trials in the Eastern District of Michigan because of COVID-19, *see* 20-AO-038, 21-AO-006, the Court will refer the remainder of the case to mediation with Mr. John DeGroote.[4] The mediation must occur no later than February 28, 2022.

## ORDER

**WHEREFORE** it is hereby **ORDERED** that Defendant G4S Secure Solutions's motion for summary judgment [64] is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant Quality Carriers's motion for summary judgment [65] is **GRANTED**.

---

[4] John DeGroote is a skilled federal mediator in Dallas, Texas. He can be reached at (214) 887-3484 and at john@degrootepartners.com.

**IT IS FURTHER ORDERED** that the Court **REFERS** the remaining parties to Mr. John DeGroote for mediation and settlement discussions and **ORDERS** the parties to proceed in compliance with Local Rule 16.4. The mediation and settlement discussions must occur no later than **February 28, 2022**. The parties must contact Mr. DeGroote and provide him with a copy of this order as soon as practicable and must **NOTIFY** the Court of the date of the mediation session once it is scheduled.

**IT IS FURTHER ORDERED** that Mr. DeGroote must **NOTIFY** the Court within seven days of completion of the mediation, stating only the "date of completion, who participated, whether settlement was reached, and whether further [alternative dispute resolution] proceedings are contemplated." E.D. Mich. L.R. 16.4(e)(6). If a settlement is reached, the parties must **NOTIFY** the Court immediately upon completion of the mediation and must **SUBMIT** a proposed order of dismissal within twenty-one days. *Id.* at 16.4(e)(7). If a settlement is not reached, the parties must **NOTIFY** the Court within seven days of the completion of the mediation.

**IT IS FURTHER ORDERED** that if the parties cannot resolve the case with Mr. DeGroote's assistance, they must **SUBMIT** a joint status report, no later than seven days after the mediation, informing the Court whether they will consent to a bench trial.

**SO ORDERED.**

s/ Stephen J. Murphy, III
STEPHEN J. MURPHY, III
United States District Judge

Dated: November 29, 2021

23

## <u>CERTFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on November 29, 2021, by electronic and/or ordinary mail.

s/ David P. Parker
Case Manager